[PUBLISH]

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10168

_____

STATE OF WEST VIRGINIA, by and through Patrick Morrisey,
Attorney General of the State of West Virginia,
STATE OF ALABAMA, by and through Steve Marshall,
Attorney General of the State of Alabama,
STATE OF ARKANSAS, by and through Leslie Rutledge,
Attorney General for the State of Arkansas,
STATE OF ALASKA, by and through Treg R. Taylor,
Attorney General of the State of Alaska,
STATE OF FLORIDA, by and through Ashley Moody,
Attorney General for the State of Florida,
STATE OF IOWA,
STATE OF KANSAS, by and through Derek Schmidt,
Attorney General for the State of Kansas,
STATE OF MONTANA, by and through Austin Knudsen,
Attorney General of the State of Montana,
STATE OF NEW HAMPSHIRE,

STATE OF OKLAHOMA, by and through Mike Hunter,
Attorney General of the State of Oklahoma,
STATE OF SOUTH CAROLINA, by and through Alan Wilson,
Attorney General of the State of South Carolina,
STATE OF SOUTH DAKOTA, by and through Jason R. Ravnsborg,
Attorney General of the State of South Dakota,
STATE OF UTAH, by and through Sean Reyes,
Attorney General of the State of Utah,

Plaintiffs-Appellees,

*versus*

U.S. DEPARTMENT OF THE TREASURY,
SECRETARY, U.S. DEPARTMENT OF THE TREASURY,
ACTING INSPECTOR GENERAL OF THE
DEPARTMENT OF THE TREASURY,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:21-cv-00465-LSC

_____

Before LUCK, BRASHER, and ED CARNES, Circuit Judges.

BRASHER, Circuit Judge:

The Constitution does not give the federal government authority to require states to enact the laws or policies that Congress prefers. But it does give Congress the power of the purse. The Spending Clause of the U.S. Constitution grants Congress the power to impose taxes and borrow money to "pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Although the federal government cannot control state conduct directly, Congress often uses its power to tax and spend as a work-around—offering federal funds in exchange for states establishing preferred programs or enacting favored laws.

This appeal is about one of the limits of that authority. Thirteen states sued the Treasury Secretary and related officials to challenge a tax offset provision in the American Rescue Plan Act, a coronavirus stimulus package passed by Congress in 2021. That offset provision prohibits states from using Rescue Plan funds "to either directly or indirectly offset a reduction in [their] net tax revenue" that results from a change in law that "reduces any tax." 42 U.S.C. § 802(c)(2)(A). The States argued that this "tax mandate" exceeds Congress's authority under the Constitution. The district court agreed and permanently enjoined enforcement of the offset provision. The Secretary appealed.

We must decide two questions that the district court resolved in favor of the States. First, we must decide whether the States' challenge presents a justiciable controversy. Second, if any of the States' claims are justiciable, we must decide whether the offset provision is unconstitutional. We believe the district court answered both questions correctly. Specifically, we conclude that the States' challenge is justiciable and that the condition imposed by the offset provision is not sufficiently ascertainable. Because we conclude that this claim is both justiciable and successful, we do not address the States' other claims.

## I.

The seeds of this controversy were sown when Congress passed the American Rescue Plan Act of 2021, a $1.9 trillion stimulus package aimed at mitigating the economic and public health effects caused by the coronavirus pandemic. Pub. L. No. 117-2, 135 Stat. 4. President Biden signed the bill into law on March 11, 2021. The President described the legislation as a tool for "rebuilding the backbone of this country and giving people in this Nation . . . a fighting chance." Remarks on Signing the American Rescue Plan Act of 2021, 2021 Daily Comp. Pres. Doc. 220 (Mar. 11, 2021).

The Rescue Plan is a voluminous Act spanning hundreds of pages. *See* Pub. L. No. 117-2, 135 Stat. 4. Central to this appeal, the Act appropriated $195.3 billion to make payments to each of the fifty states and the District of Columbia, 42 U.S.C. § 802(b)(3)(A), which the states may use for four enumerated purposes: (1) "to

respond to the public health emergency" caused by the coronavirus pandemic or "its negative economic impacts"; (2) to support essential workers; (3) to provide "government services to the extent" that the pandemic reduced states' revenues; and (4) to invest in infrastructure, *id.* § 802(c)(1)(A)–(D).

But the Act contains some fine print—it imposes several additional restrictions on the states as a condition of receiving funds. Relevant here, states cannot "use [Rescue Plan] funds . . . to either *directly or indirectly* offset a reduction in the[ir] net tax revenue" resulting from a change in state law "during the covered period that reduces any tax . . . or delays the imposition of any tax or tax increase." *Id.* § 802(c)(2)(A) (emphasis added). To receive the federal funds, a state must certify that it needs the payment to carry out one of the Act's four enumerated purposes and will comply with this offset provision. *Id.* § 802(d)(1). States must also provide a "detailed accounting of . . . all modifications to [their] . . . tax revenue sources during the covered period." *Id.* § 802(d)(2). The "covered period" began on March 3, 2021, and "ends on the last day of the [state's] fiscal year . . . in which all [Rescue Plan] funds . . . have been" spent by the state or have been recovered by or returned to the Treasury Secretary. *Id.* § 802(g)(1). The Secretary can recoup any funds from the states used in violation of Section 802(c)'s offset provision. *Id.* § 802(e). The Act provides that funds appropriated for payments to the states will remain available through December 31, 2024. *Id.* § 802(a)(1).

Some states signed on the dotted line. But on March 31, 2021, thirteen states[1] sued in the United States District Court for the Northern District of Alabama, challenging Section 802(c)'s offset provision, or so-called "tax mandate." The complaint averred three claims: first, that Section 802(c)'s offset provision is an unconstitutionally ambiguous and coercive condition under the Spending Clause; second, that the offset provision violates the Tenth Amendment's anti-commandeering doctrine; third, that the harms alleged in the first two counts entitle the States to declaratory relief under 28 U.S.C. § 2201.

Two weeks later, while their complaint remained pending, the States sought to preliminarily enjoin the offset provision's enforcement, arguing that they needed immediate relief before submitting the certification required by Section 802(d)(1). The district court denied that motion. It concluded that the States had met the three standing requirements—injury-in-fact, causation, and redressability. It also found that the States sufficiently alleged a "credible threat" of enforcement in the form of a recoupment action. *West Virginia v. U.S. Dep't of Treasury*, No. 7:21-cv-00465-LSC, 2021 WL 2952863, at *7 (N.D. Ala. July 14, 2021). But the district court determined that there was "virtually no likelihood" that the

---

[1] The thirteen states were Alabama, Alaska, Arkansas, Florida, Iowa, Kansas, Montana, New Hampshire, Oklahoma, South Carolina, South Dakota, Utah, and West Virginia. The States sued the Treasury Department, Treasury Secretary, and Inspector General of the Treasury Department. We will refer to the plaintiffs as the States and the defendants as the Secretary.

Secretary would recoup any Rescue Plan funds before the ultimate resolution of the case. *Id.* at *9. Because the States could not establish a likelihood of irreparable harm during the pendency of the lawsuit, the district court did not issue a preliminary injunction.

On May 17, 2021, before the district court ruled on the States' motion for preliminary injunction, the Treasury Department issued an interim final rule to clarify the Rescue Plan's contours and scope. *See* Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26786 (May 17, 2021). Recognizing that "money is fungible," the interim final rule creates a framework for deciding whether a state has improperly offset a reduction in net tax revenue with Rescue Plan funds. *Id.* at 26807–11. The rule makes clear that "failure to comply with the [offset provision's] restrictions on use . . . may result in recoupment of funds." *Id.* at 26811 (footnote omitted). And the rule provides a detailed recoupment procedure. *Id.* at 26811–12.

The rule sets the net tax revenue baseline for judging compliance with the offset provision at "fiscal year 2019 tax revenue adjusted for inflation." *Id.* at 26808. It provides a four-part process to "determin[e] whether, and the extent to which, Fiscal Recovery Funds have been used to offset a reduction in net tax revenue" as compared to the 2019 baseline. *Id.* at 26807. As part of this rubric, recipient states must "identify and value the changes in law, regulation, or interpretation that would result in a reduction in net tax revenue." *Id.* If one of these changes results in a reduction from the 2019 baseline as adjusted for inflation, then a state must "identify

sufficient funds from sources *other than* the Fiscal Recovery Funds to offset the reduction in net tax revenue." *Id.* (emphasis added). Permissible funding sources to offset a reduction in net tax revenue include "organic growth, increases in revenue (e.g., an increase in a tax rate), and certain cuts in spending." *Id.* But the rule prohibits recipient states from offsetting reductions in net tax revenue by cutting spending "in an area where" they had "spent Fiscal Recovery Funds." *Id.* at 26809.

Shortly thereafter, ten of the thirteen States[2] stipulated that they had certified their compliance with the offset provision to the Secretary, as required by Section 802(d), and had received Rescue Plan funds. Moreover, all thirteen States enacted tax-related laws (*e.g.*, credits, exemptions, phaseouts, reductions) during the covered period.

The States moved for a permanent injunction and declaratory judgment. This time, the district court granted the States' motion and awarded them a permanent injunction. Like before, the district court concluded that the States had standing to sue. Turning to the merits, the district court reasoned that the offset provision was unconstitutionally ambiguous under the Spending Clause. Noting that (1) "[m]oney is fungible" and (2) the Act did not flesh out what "directly or indirectly" means, the district court concluded that receiving any Rescue Plan money could potentially

---

[2] The ten states were Alabama, Arkansas, Alaska, Florida, Iowa, Kansas, Montana, New Hampshire, Utah, and West Virginia.

constitute an indirect offset "in [a state's] net tax revenue from a change in state law or policy." *West Virginia v. U.S. Dep't of Treasury*, 571 F. Supp. 3d 1229, 1250 (N.D. Ala. 2021). The Rescue Plan, the district court observed, left states holding the bag, with "*no guidance* on critical interpretive questions," like how they can avoid indirectly offsetting net tax revenue with recovery funds. *Id.* at 1253. The Act is therefore inherently ambiguous, and that ambiguity may disincentivize the States in a way that unconstitutionally infringes on state sovereignty.

Addressing the interim rule, the district court determined that it did not cure the Act's constitutional defects. The district court explained that the Secretary appeared to concede that a federal rule cannot remedy a statute's facial unconstitutionality. The district court also believed that the rule was still too ambiguous on certain points.

Finding that (1) the States "suffered an irreparable injury," (2) no adequate remedy at law could "compensate for that injury," (3) balancing the parties' hardships favored the States, and (4) an injunction would serve the public interest, the district court permanently enjoined the Secretary from enforcing the offset provision. *Id.* at 1255 (quotation omitted). The district court did not reach the States' coercion and anti-commandeering concerns. Nor did it enter a declaratory judgment for the States because the permanent injunction would fully rectify the harm.

The Secretary timely appealed. The Secretary also implemented a final rule on January 27, 2022, which did not materially

differ from the interim final rule. *See* Coronavirus State and Local Fiscal Recovery Funds, 87 Fed. Reg. 4338 (Jan. 27, 2022).

## II.

We will uphold a district court's decision to enter a permanent injunction unless we perceive an abuse of discretion. *See Jones v. Governor of Fla.*, 975 F.3d 1016, 1028 (11th Cir. 2020). We review underlying legal conclusions and a challenged statute's constitutionality *de novo*, but factual findings for clear error. *Id.*; *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013).

## III.

The States argue that the offset provision is unconstitutional for three independent reasons: first, the condition it imposes is not ascertainable under the Spending Clause; second, it is coercive under the Spending Clause; third, it violates the Tenth Amendment by unlawfully commandeering the States. Conversely, the Secretary contends that the suit is not justiciable and that, on the merits, the offset provision violates neither the Spending Clause nor the Tenth Amendment. Because we agree with the district court that (1) the suit is justiciable and (2) the condition imposed by the offset provision is not ascertainable, we do not address the States' remaining constitutional claims. We will start with the Secretary's justiciability arguments and then address the merits of the States' ascertainability claim.

### A.

The Secretary contends that this case does not present a justiciable controversy and that the "posture of this suit is unprecedented." Appellants' Br. at 7. The Secretary makes two arguments on this front. First, she argues that the States lack standing to challenge the offset provision because the Secretary has not initiated a recoupment action against any of them. Thus, so the argument goes, because our interpretation of the offset provision would occur in a hypothetical context, it would constitute an improper exercise of judicial authority under Article III of the Constitution. Second, the Secretary's argument suggests that the States' challenge is moot because the Secretary's recent regulation makes it unlikely that the offset provision will be enforced against the States. The reasoning would be that, because the regulation adopts a limiting construction of the offset provision, the States are unlikely to act in a way that will result in a recoupment action going forward.

We address each of these arguments in turn. Although we recognize these arguments carry some persuasive force, we conclude that the States have standing and that the Secretary's regulation does not moot their ascertainability challenge.

### 1.

We start with standing. We assess Article III standing at the time the complaint is filed. *See Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1003 (11th Cir. 2020). "Standing doctrine functions to ensure, among other things, that the scarce resources of

the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000). Standing "in no way depends on the merits" of the plaintiff's claim. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Instead, the "irreducible constitutional minimum of standing" requires three elements: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent," (2) a "causal connection between the injury and the conduct complained of," and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations omitted).

Starting with injury-in-fact, the States have two theories for why they have suffered an actual and concrete harm.[3] First, the States argue that their inability to ascertain the condition imposed by the offset provision has already infringed, and continues to infringe, on the States' sovereign prerogatives as parties to a contract with the federal government. Second, the States argue that they are subject to the threat of a recoupment action if they spend funds contrary to the offset provision. We agree that these theories establish that the States have suffered an injury-in-fact.

First, we conclude that the offset provision's ambiguity has injured, and continues to injure, the States' sovereign interests. The States are challenging a so-called "unconstitutional condition" that was attached to federal funding. *See Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004). Though not "*all* contract-law rules

---

[3] The States also raise other grounds for injury-in-fact, which we do not reach.

apply to Spending Clause legislation," *Barnes v. Gorman*, 536 U.S. 181, 186 (2002), we can analogize the relationship between Congress and the States in Spending Clause situations to that between contracting parties. In essence, the States say that they were coerced into accepting an offer with an unascertainable condition, they did accept the offer with the condition, and the terms of the resulting contract are presently in force and effect. Indeed, the Secretary concedes that the offset provision limits the ways in which the States can spend funds.

This injury to state sovereignty is, to be sure, intangible. But it is nonetheless concrete. States "are not normal litigants for the purposes of invoking federal jurisdiction" and may suffer injuries to their sovereignty that private parties do not. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). That the offset provision restricts the ways in which states may reduce tax receipts or change tax rates heightens its effect on state sovereignty. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 428 (1819) (noting that the power to tax "is essential to the very existence of government").

Moreover, this injury has already occurred and is continuing. The offset provision is in effect until the "last day of the [last] fiscal year" in which a state spends the Act's funds or returns them to the Secretary. 42 U.S.C. § 802(g)(1). And, by the Act's terms, the funds are available until December 31, 2024. *Id.* § 802(a)(1). All the States have now accepted the deal with its allegedly unconstitutional condition, and that condition is a present and continuous infringement on state sovereignty. Any state that "has failed to

comply" with the offset provision is "required to repay to the Secretary an amount equal to the amount of funds used in violation of [the Act]." *Id.* § 802(e). To the extent the States seek a remedy to this sovereign injury, this litigation is not a pre-enforcement challenge. Instead, the States seek to remedy an injury that has already happened and that the States continue to experience.

We are not the first court of appeals to address this theory of state standing to sue over the offset provision, and we find the Ninth Circuit's reasoning on this point particularly persuasive. Analogizing to contract law, the Ninth Circuit reasoned that "[j]ust as a contract can be challenged under state law for containing ambiguous terms or being a product of duress, so too . . . the quasi-contractual funding offer at issue here can be challenged by Arizona at the outset for offering conditions that are unconstitutionally ambiguous or coercive." *Arizona v. Yellen*, 34 F.4th 841, 853 (9th Cir. 2022). Because the injury to state sovereignty occurs when a state must accept or reject an unascertainable funding offer, the state does "not need to first violate a condition of an allegedly unconstitutional contract to have standing to challenge it." *Id.*; *see also Henry v. Att'y Gen., Ala.*, 45 F.4th 1272, 1288 (11th Cir. 2022).

Turning to the States' second theory for an injury-in-fact, the States say that they are injured by the threat of a recoupment proceeding. The States submitted evidence that they have enacted tax cuts and related revenue laws that could reduce their net tax revenue and trigger the offset provision, which the Secretary is

committed to enforcing. This evidence, the States say, establishes their standing for a pre-enforcement challenge to the offset provision.

We also agree that the States have an injury-in-fact under this pre-enforcement theory. A plaintiff need not "expose himself to liability" to have standing to challenge the enforcement of a law. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). Instead, in a pre-enforcement constitutional challenge, the injury-in-fact requirement can be satisfied by establishing "a realistic danger of sustaining direct injury" from "the statute's operation or enforcement." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012) (quotations omitted) (analyzing a constitutional challenge to a state statute). A plaintiff must establish "(1) that he has 'an intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) that his conduct is 'arguably proscribed,' and (3) that he is subject to 'a credible threat of enforcement.'" *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119–20 (11th Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014)).

We believe the States have met the test for a pre-enforcement lawsuit. There is no question that the States intend to continue cutting taxes and modifying their overall revenue. All the States enacted revenue-related laws dealing with, among other things, tax credits, exemptions, phaseouts, and reductions after March 3, 2021, the beginning of the Rescue Plan's "covered period." Moreover, the States submitted a declaration by Alabama

State Senator Albritton, who noted that state legislatures must ensure that expenditures do not exceed estimated revenues and resources. This balancing exercise requires understanding how tax receipts will affect overall revenue, and state legislators often pass tax-related laws to assist with budget balancing and to benefit constituents. There is also no dispute that the Secretary intends to enforce the offset provision against the States if she thinks they have violated it. The Secretary's interim final rule underscores that recoupment actions are still on the table if States impermissibly offset reductions in net tax revenue with Rescue Plan funds. Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. at 26808 (describing how the interim final rule "implements a process for recouping Fiscal Recovery Funds" used in violation of the Act).

The Secretary argues that the offset provision does not proscribe the States' conduct because "its text makes clear" that States may cut taxes so long as they "pay" for a tax cut without using Rescue Plan funds. Appellants' Reply Br. at 2. This argument—that the offset provision is clear—goes to the merits of the States' claims, not their standing to raise them. When we assess standing, we "'must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.'" *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)).

Reviewing the text of the statute for standing purposes, we believe the States have shown that the offset provision arguably

proscribes their conduct. The offset provision prohibits states from using federal funds to "either directly or indirectly offset a reduction in the[ir] net tax revenue" resulting from a change in state law "during the covered period that reduces any tax . . . or delays the imposition of any tax or tax increase." 42 U.S.C. § 802(c)(2)(A). Money is fungible. By prohibiting both direct and "indirect" offsets, the provision arguably proscribes a state from accepting the money if it enacts any tax cut. The only way for the States to achieve unequivocal compliance with the Act is to refrain from cutting taxes during the covered period.

Having concluded that the States have suffered an injury-in-fact, we turn to the second and third elements of standing. The Secretary does not contest traceability and redressability, but we will address them anyway given our obligation to ensure our jurisdiction. *See, e.g.*, *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 877–78 (11th Cir. 2000); *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). The States' injury is "fairly . . . trace[able]" to the challenged conduct, namely, the promulgation and enforcement of the allegedly unconstitutional offset provision. *Lujan*, 504 U.S. at 560 (alteration in original). And this injury is plainly redressable. No one disputes that—absent court intervention—the States are bound to comply with the offset provision and that the Secretary intends to enforce it going forward. Like any other contracting party bound to an objectionable provision in a contract, the States' injury can be redressed by declaring that provision null and void. This is a standard remedy when a single provision of a contract is

contrary to public policy. *See* Restatement (Second) of Contracts § 178 & cmt. f (Am. L. Inst. 1981); *id.* § 183. And it redresses the States' injury by preventing the enforcement of the objectionable provision. *See Harrell v. The Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010) ("As for the redressability prong, if the challenged rules are stricken as unconstitutional, Harrell simply need not contend with them any longer.").

In short, the States argue that the agreement's terms are not "reasonably certain," Restatement § 33(1), because no one knows what a "reduction in the net tax revenue" and "indirectly offset" mean. They contend that Congress cannot craft a deal that explains "only *some* of the strings attached." Appellees' Br. at 33. And they argue that, because of the offset provision's ambiguity, they cannot determine at what point a breach will occur. *Id.* § 33(2). The States request a judicial remedy so that they do not have to comply with any aspect of the offset provision, which they contend is unenforceable in all respects. The States have standing to make these claims.

2.

We turn now to the Secretary's related (and somewhat implicit) argument that, even if the States had standing to file this suit initially, it has become moot. "Mootness can occur due to a change in circumstances, or . . . a change in the law." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004). The Secretary says that she has disclaimed the broad reading of the offset provision that would stop the States from cutting taxes.

Accordingly, the Secretary does not intend to enforce the provision to recoup money based on tax cuts "as long as [the States] can pay for the tax cuts using their own funds." Appellants' Reply Br. at 2. The Secretary explains that she has formalized this reading of the offset provision in a regulation.

We cannot say that the Secretary's decision to disclaim a broad reading of the offset provision moots the States' ambiguity challenge. There is no doubt that the Secretary's narrow construction of the offset provision reduces its effect on state sovereignty. But the justiciability question is not quantitative; "rather, the focus is on the qualitative nature of the [plaintiff's] injury, regardless of how small the injury may be." *See Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019) (quotation omitted). Even if the Secretary gives it a narrow reading, the offset provision continues to limit how the States may use federal funds. To the extent the limitation is unascertainable, it remains an unconstitutional condition on those funds.

The Secretary cites the Eighth Circuit's decision that states do not have standing to challenge the constitutionality of the "broad interpretation" of the offset provision. *Missouri v. Yellen*, 39 F.4th 1063, 1069–70 (8th Cir. 2022). But we think this case is distinguishable. In *Missouri*, unlike in this case, the state was "not challenging the Offset Restriction as written, but rather a specific potential interpretation of the provision." *Id.* at 1069. The Secretary disclaimed that interpretation of the provision, and the court reasoned that it could not "declare, in the abstract, what a statute does

not mean." *Id.* at 1070. Here, on the other hand, the States are challenging the offset provision's ascertainability. They seek not a judicial determination of what it means, but a judicial determination that it is too ambiguous to be enforced in any respect. Even if we were to extend the Eighth Circuit's reasoning on the standing question to apply in the mootness context, the Secretary's regulation and litigating position do not moot that claim.

The Sixth Circuit has concluded that the Secretary's embrace of a narrower construction, as represented by her regulation and litigation position, mooted certain state challenges to the offset provision. *See Ohio v. Yellen*, 53 F.4th 983, 990–92 (6th Cir. 2022); *Kentucky v. Yellen*, 54 F.4th 325, 340–41 & n.11 (6th Cir. 2022). The court explained that the Secretary had disclaimed enforcement of the offset provision except in limited circumstances. *Kentucky*, 54 F.4th at 340–41. Addressing the states' injuries, the court reasoned that "because the States failed to provide evidence that they intend to specifically violate *the Rule* (and provoke recoupment), and because Treasury established that there is no realistic prospect it will enforce the States' expansive interpretation of the Offset Provision, we deem the imminent-recoupment and sovereign-authority theories moot." *Id.* at 341.

We disagree with this reasoning. A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (quotations omitted). Although the Secretary has adopted a narrow construction of the offset provision, she

has not disclaimed an intent to enforce the provision. Instead, she has done the opposite, adopting a regulation that warns the States that they must comply with a provision that they contend is unconstitutional in all respects. We see no basis in mootness doctrine to conclude that the Secretary's willingness to provide a lesser remedy (a narrower construction) to address the States' constitutional challenge moots the States' request for a more substantial remedy (facial invalidation). "Even with the Rules, the States still need injunctive and declaratory relief to avoid Treasury's enforcement of ARPA's unconstitutionally vague conditions." *Kentucky*, 54 F.4th at 362 (Nalbandian, J., concurring in part and dissenting in part).

Our answer to the mootness question would be different if the Secretary had disclaimed an intention to enforce the allegedly unconstitutional provision at all. Indeed, "this Court has consistently held that a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1285 (11th Cir. 2004). But an agency cannot "cure" a standardless grant of authority by "adopting in its discretion a limiting construction." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). Likewise, an executive agency's narrow construction cannot moot a plaintiff's constitutional challenge when the very constitutional problem is that the statute provides too vague a standard. It is "the existence, not the imposition, of standardless requirements that causes" an injury. *CAMP Legal*

*Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006); *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 772 (1988) (holding that a statute "placing unbridled discretion in the hands of a government official or agency" is unconstitutional). Despite the Secretary's regulation and her litigation position adopting a narrow construction of the offset provision, the States have a continuing interest in challenging the validity of the offset provision, and the Secretary has a continuing interest in defending its facial constitutionality.

Finally, as we have already explained, the States are not undifferentiated members of the public seeking to enjoin the enforcement of a law of general applicability. They are more like parties to a contract, seeking to adjudicate its terms. That contract provides funds until the end of 2024, and its obligations run until the "last day of the [last] fiscal year" in which the funds are spent or returned. 42 U.S.C. § 802(g)(1). We conclude that the States' lawsuit is not moot.

## B.

We now turn to the merits of the States' constitutional claim. The States argue that the offset provision violates the Spending Clause because they cannot ascertain the condition it imposes on Rescue Plan funds. We agree.

The Spending Clause authorizes Congress to "lay and collect Taxes, . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl.

1. This clause gives Congress a wide berth not only to tax and spend but also to exert influence on the states by attaching strings to federal funding. *See Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 576 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.). Congress may, within limits, compel states to "tak[e] certain actions that [it] could not [otherwise] require them to take," and a state's acceptance of the federal funds will generally constitute consent to the conditions imposed by Congress. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999).

The Supreme Court's leading authority on the limits of the Spending Clause is *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981). There, the Supreme Court held that, by virtue of the Spending Clause, Congress can amplify its enumerated Article I powers and influence state regulatory policy by "fix[ing] the terms on which it shall disburse federal money to the States." *Id.* at 17. In this sense, "legislation enacted pursuant to the spending power" is a species of contract. *Id.* But the Court recognized that this broad authority is not limitless, and Congress must speak "unambiguously" and "with a clear voice" when it imposes conditions on federal funds. *Id.* Specifically, Congress must speak clearly enough for "the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* The Court explained that a state cannot knowingly accept a condition if it "is unable to ascertain what is expected of it." *Id.*

The Court elaborated on this ascertainability principle in *South Dakota v. Dole*, 483 U.S. 203 (1987). In *Dole*, the Court identified five elements that conditional funding grants must satisfy to pass constitutional muster under the Spending Clause: (1) the expenditure must "advance the general welfare"; (2) any attached condition must be "unambiguous[]"; (3) conditions must relate "to the federal interest in particular national projects or programs"; (4) conditions cannot violate another constitutional provision; and (5) conditions cannot "be so coercive . . . [that] pressure turns into compulsion." *See id.* at 207–11 (quotations omitted). If the expenditure or condition does not satisfy these elements, then it is unconstitutional.

It is against this backdrop that we turn to the merits. The Secretary makes three arguments for why the offset provision is a proper exercise of Congress's spending powers. First, the Secretary contends that the ascertainability principle set out in *Pennhurst*—and refined in *Dole*—is a rule of statutory construction, not a basis for holding a congressional spending condition facially unconstitutional. Second, the Secretary posits that the offset provision is clear enough for the States to ascertain what is expected of them as a condition of accepting funds. Third, the Secretary says that her rule provided an ascertainable condition by resolving ambiguities in the offset provision. We are not persuaded.

1.

As an initial matter, the Secretary urges us to view *Pennhurst*'s ascertainability principle and *Dole*'s "unambiguous" requirement as rules of construction, not reasons to enjoin the enforcement of a spending condition. The Secretary argues that these are merely "tool[s] of statutory interpretation" to be applied "in resolving concrete disputes." Appellants' Reply Br. at 5. We believe our precedent compels a different result. But even if it did not, we think *Dole* and basic contract principles independently demand such a result.

We will start with our precedent. We addressed the ascertainability requirement in *Benning v. Georgia*, which involved a prisoner's claim that the State of Georgia had infringed on his right to practice his religion by denying him a kosher diet and not allowing him to wear a yarmulke. *See* 391 F.3d 1299,1303 (11th Cir. 2004). He alleged that such conduct violated section 3 of the Religious Land Use and Institutionalized Persons Act (RLUIPA), a federal statute that prohibited state prisons receiving federal funds from burdening prisoners' religious freedom. *Id.* RLUIPA "applie[d] strict scrutiny to government actions that substantially burden[ed]" prisoners' religious exercise and waived Georgia's sovereign immunity in "suits filed by prisoners to enforce" the Act. *Id.* at 1304–05.

Georgia defended the lawsuit on the grounds that section 3 of RLUIPA was unenforceable because it was facially

unconstitutional. *Id.* at 1303. Specifically, Georgia argued that "the standard of least restrictive means is too ambiguous to allow a state an informed choice." *Id.* at 1305. We disagreed. We explained that Congress must spell out a condition "clearly enough for the states to make an informed choice." *Id.* at 1306. But we concluded that condition was ascertainable because it (1) clearly caused "states [to] incur an obligation when they accept[ed] federal funds" and (2) imposed strict scrutiny, a well understood means-end test, which was "far from ambiguous." *Id.* at 1306–07. Thus, Congress validly exercised its spending power in enacting the statute, even if it did not "specifically identify and proscribe in advance every conceivable state action that would be improper." *Id.* at 1306 (quotation omitted). We held that "[i]t is sufficient for the text of RLUIPA to link unambiguously its conditions to the receipt of federal funds and define those conditions clearly enough for the states to make an informed choice." *Id.*

The Secretary's rule-of-construction argument is inconsistent with *Benning*. To resolve that case, we followed a core tenet from *Dole*—"conditions on the state receipt of federal funds *must be unambiguous*." *Id.* at 1305 (citing *Dole*) (emphasis added). And we applied it to Georgia's argument that section 3 of RLUIPA was constitutionally invalid on its face, resolving that claim on its merits. *See id.* at 1303–04, 1313. *Benning* therefore established the proposition that the ascertainability principle is more than a precatory rule of construction to be used in as-applied challenges—it is a binding constitutional command.

We think *Benning* is dispositive, but even if it were not, we would still reject the Secretary's argument on this front. The Supreme Court's precedents leave little doubt that the ascertainability requirement is more than a rule of construction. In *Dole*, for example, the Supreme Court expressly stated that a spending condition must be "unambiguous[]." 483 U.S. at 207 (quotation omitted). Likewise in *Pennhurst*, the Court said Congress must speak "unambiguously" when it imposes conditions on federal funds. 451 U.S. at 17. Neither *Pennhurst* nor *Dole* suggests that this clarity element is hortatory.

Similarly, *Dole*'s treatment of coercion buttresses our belief that unascertainability alone can render a spending restriction facially unconstitutional. *Dole* made clear that coercion will sometimes rise to unconstitutional compulsion, which can render a spending restriction unenforceable. *See* 483 U.S. at 211. And the Supreme Court has enjoined spending conditions that flunked this coercion test. *See NFIB*, 567 U.S. at 579–81, 588 (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.); *id.* at 681–89 (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.). A lack of coercion is one of the five elements that a conditional funding grant must satisfy to pass constitutional muster under the Spending Clause. The *Dole* factors are not hierarchical; none of them, not even coercion, is owed preferential treatment by the courts. All five factors are equally important and equally required. It therefore cannot be true that the presence of coercion suffices to invalidate a spending condition, but a lack of clarity does not.

Finally, we think principles of contract law are also illustrative. Here, Congress, the offeror, has contracted with the States, the offeree. It is hornbook contract law that an offeree cannot accept a bargain's terms "so as to form a contract unless the terms . . . are reasonably certain." Restatement (Second) of Contracts § 33(1) (Am. L. Inst. 1981). "[R]easonably certain" terms "provide a basis for determining" whether a breach occurred and "for giving an appropriate remedy." Id. § 33(2). Moreover, the problem of indefiniteness is not always a mere issue of construction in contract law; it may go to the validity of the contract itself. See id. § 33 cmt. a (noting that "determining whether a manifestation of intention is intended to be understood as an offer" may require ensuring that the agreement can "be[] given an exact meaning and that all the performances to be rendered [are] certain"); 17A Am. Jur. 2d Contracts § 188 (2022) ("Definiteness as to material matters is of the very essence of contract law, and impenetrable vagueness and uncertainty will not do."). An enforceable contract "must be sufficiently definite as to its essential or material terms," including "subject matter, quantity, and duration, so that the promises and performance to be rendered by each party are reasonably certain." 17A Am. Jur. 2d Contracts § 188 (2022) (footnotes omitted).

Accordingly, our decision in Benning compels today's holding that ascertainability is not merely a rule of construction, but a stand-alone constitutional requirement. Even without this precedent, however, we would hold that spending restrictions imposed by Congress must be ascertainable to be enforceable. We therefore

reject the Secretary's argument that a spending condition may be facially constitutional even if it is not ascertainable outside of an as-applied challenge.

2.

We next decide whether the condition imposed by the offset provision is ascertainable. The States argue that they do not know what it means to use federal funds to "directly or indirectly offset a reduction in the[ir] net tax revenue" caused by a tax cut. The Secretary says that the offset provision provides sufficient clarity about Congress's conditions on recovery funds. Again, we disagree with the Secretary.

A state's knowledge that strings attach to federal funds is necessary, but not sufficient, for the conditions to comport with the Spending Clause. A state must also "clearly understand . . . the obligations" of the deal and "cannot knowingly accept conditions of which [it is] 'unaware' or which" it cannot ascertain. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). When reviewing a spending condition, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law." *Pennhurst*, 451 U.S. at 18 (quotations omitted). A law must "unambiguously" link "its conditions to the receipt of federal funds and define those conditions clearly enough for the states to make an informed choice." *Benning*, 391 F.3d at 1306. Otherwise, state recipients would not know what rules they must follow and "what

sort of penalties might be on the table." *Kentucky*, 54 F.4th at 348 (quoting *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022)).

Here, the Rescue Plan's offset provision forbids states from using recovery funds "to either directly or indirectly offset a reduction in [their] net tax revenue . . . resulting from a change in law, regulation, or administrative interpretation . . . that reduces any tax." 42 U.S.C. § 802(c)(2)(A). Certain parts of this provision are clear enough. For example, a "change in law" refers to any law passed or amended during the covered period, which the Act defines as the period between March 3, 2021, and "the last day of the [state's] fiscal year . . . in which all [Rescue Plan] funds . . . have been" spent by the state or either recovered by or returned to the Secretary. *Id.* § 802(g)(1). Likewise, the Act supplies examples of what constitutes "reduc[ing] any tax"—rate reductions, rebates, deductions, or credits. *Id.* § 802(c)(2)(A).

But there are three aspects of the Rescue Plan that give us pause. We do not address whether any of these aspects would independently violate the Spending Clause. But, when combined, we believe these three aspects of the Rescue Plan are inconsistent with the constitutional imperative that Congress's funding conditions be ascertainable.

First and most importantly, the offset provision does not provide a standard against which a state can assess whether it will reduce or has reduced net tax revenue. The prohibition on any "reduction in the net tax revenue" presupposes a baseline against

which to measure a potential reduction. Reduced as compared to what? The Rescue Plan does not offer a baseline. Although the Secretary's rule supplies a benchmark, the Rescue Plan itself does not provide any way to determine whether net tax revenues have been reduced.

This lack of a baseline affects whether a state policymaker can understand and comply with the statute. Consider a hypothetical state sales tax cut, for example. The state legislature predicts that consumption will increase in the next fiscal year and enacts a sales tax rate reduction based on its forecast that overall tax receipts will stay the same even if the rate is lower. Suppose that the legislature is correct—consumption increased so much that year-over-year sales tax revenue stayed the same or grew despite the rate reduction. If the baseline is the total tax revenue—which grew or stayed the same—then the legislature has not violated the Rescue Plan. But if the baseline is what sales tax revenue *would have been* absent the tax cut, the legislature would have effectuated a "reduction in the net tax revenue." 42 U.S.C. § 802(c)(2)(A).

Citing *Benning*, the Secretary argues that the Rescue Plan sufficiently makes clear that the States cannot use recovery funds to finance tax cuts, even though it leaves open whether any particular tax cut may violate the provision. We disagree. In *Benning*, we held that a standard like strict scrutiny is ascertainable even though it could have difficult-to-predict applications in particular cases. *Benning*, 391 F.3d at 1306–07. But the problem here is that the offset provision provides no standard at all. As we have explained,

32                    Opinion of the Court                    22-10168

without a baseline, there is no way to assess whether a tax cut has caused a "reduction in the net tax revenue." 42 U.S.C. § 802(c)(2)(A). The problem is not just that the States cannot know what the offset provision means as to a *particular* tax cut; it is that the States cannot know what it means as to *any* tax cut. There is no standard akin to strict scrutiny by which to assess the States' compliance with the offset provision.

Second, the Rescue Plan's prohibition against "either directly or indirectly offset[ting]" net tax reductions with recovery funds exacerbates this ascertainability problem. *Id.*; *see Kentucky*, 54 F. 4th at 348–49. The Act does not define "directly or indirectly," so we must turn to the ordinary meaning of the words at issue. *See United States v. Silva*, 443 F.3d 795, 797–98 (11th Cir. 2006). "Indirect" means "not immediately resulting from an action or cause" or "round-about." *Indirect, Oxford English Dictionary* (online ed. Dec. 2022). "Direct" denotes "[p]roceeding from antecedent to consequent" and "undeviating in course." *Direct, Oxford English Dictionary* (online ed. Dec. 2022) An "offset" is "anything that counterbalances, compensates, or makes up for something else." *Offset, Oxford English Dictionary* (online ed. Dec. 2022). We therefore agree with the States that the phrase "directly or indirectly offset" seems "extraordinarily expansive." Appellees' Br. at 26. Even if we accept that everyone understands what constitutes a "direct" offset, Section 802 does not explain what constitutes an "indirect" offset.

The Secretary's illustrations of the difference between "direct" and "indirect" offsets fail to clear this fog. The Secretary suggests that she would consider a direct offset to have occurred if a "State were simply to deposit [Rescue Plan funds] into its general treasury in order to fill a revenue hole" created by a tax cut. Appellants' Br. at 13. Fair enough. But then the Secretary describes an impermissible indirect offset as follows: a State reduces expenditures by $2 billion to compensate for a tax cut of the same amount and uses $2 billion in Rescue Plan funds "to pay for those expenditures instead." *Id.* Extrapolating from the second example, an indirect offset could be boundless. Even a novice in accounting readily grasps that balancing a budget requires *offsetting* revenue shortfalls with other funds—or with expenditure cuts. Thus, because money is fungible, the Secretary could always assert a plausible argument that a state, after a tax cut, committed an unlawful indirect offset of the attendant revenue shortfall.

Revisiting the Secretary's second illustration, the "indirect" language reasonably extends one more degree—rather than paying for the expenditures at issue with Rescue Plan funds (one degree of separation), a state could use those Rescue Plan funds as collateral for a third-party loan, fund the expenditures with that loan, and repay the loan with Rescue Plan money. Again, despite the two degrees of separation that would now exist between the recovery funds and the offset, the Secretary could contend that an indirect offset has still occurred. In this light, the Secretary can view any Rescue Plan funds received by the States as "indirectly offset[ting]

a reduction in the[ir] net tax revenue" from a change in state law. 42 U.S.C. § 802(c)(2)(A). We simply cannot pin down when an offset becomes attenuated enough to no longer be "indirect."

The Secretary says that the "directly or indirectly" language is mere statutory gloss to put the States on notice that they cannot engage in fiscal chicanery. In this sense, the Secretary argues, Section 802(c) would "mean the same thing" with or without that phrase. Appellants' Br. at 13. But we must "give effect to Congress' express inclusions and exclusions, not disregard them." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018). Striving for that clarity, we remain unable to surmount the linguistic hurdle before us—because of the fungibility of money, Rescue Plan funds could conceivably "indirectly offset" any reduction in net tax revenue caused by a change in law. Thus, the States may cut taxes, but the Rescue Plan leaves them guessing whether and how they can spend Rescue Plan funds after the tax cut.

Third, we think the Rescue Plan's novelty and scope compound these problems. Though "[l]egislative novelty is not necessarily fatal," it raises a red flag. *NFIB*, 567 U.S. at 549 (opinion of Roberts, C.J.). Indeed, "lack of historical precedent" often signals a "severe constitutional problem." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (quotations omitted). And we cannot ignore that Congress has aimed this novel restriction at each state's *entire* budget and every single one of its taxes. The States face billions of dollars in potential recoupment actions and must ensure that every tax and tax rate comply with

this condition. *See, e.g.*, *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.) (recognizing that the amount of the budget affected by a spending restriction bears on our constitutional analysis); *Dole*, 483 U.S. at 211–12 (holding that a congressional condition on federal funds that was directed at a "relatively small percentage" of a state's federal highway funds did not violate the Spending Clause). The Rescue Plan's novelty and scope make it even more important that Congress speak with a clear voice.

Accordingly, we hold that the condition imposed by the Rescue Plan's offset provision is not ascertainable and does not provide "clear notice," *Kentucky*, 54 F.4th at 352 (quoting *Cummings*, 142 S. Ct. at 1570), about how to comply with it, rendering it unconstitutional.

### 3.

Having addressed justiciability and the merits, we turn now to the Secretary's last argument. The Secretary suggested at oral argument that her *rule* salvages the offset provision, even if the text of the statute is unconstitutionally unascertainable. Congress gave the Secretary discretion "to issue such regulations as may be necessary or appropriate to carry out [the Act]." 42 U.S.C. § 802(f). The Secretary's rule specifies a baseline for determining whether a "reduction in . . . net tax revenue," 42 U.S.C. § 802(c)(2)(A), has occurred. *See* 86 Fed. Reg. at 26808 ("The baseline will be calculated as fiscal year 2019 (FY 2019) tax revenue indexed for inflation in

each year of the covered period . . . ."). The rule also "establishes a step-by-step process" for deciding whether a state has directly or indirectly offset a net tax revenue reduction with recovery funds. *Id.* at 26807. There is no doubt that the rule is robust and resolves many of the ambiguities about which the States complain. But we do not believe the rule defeats the States' constitutional arguments.

As an initial matter, we are not confident that the Secretary preserved this argument for our review. The district court expressly found that the Secretary "appear[ed] to concede that, assuming that the language of the Tax Mandate is itself unconstitutionally ambiguous, the Final Rule cannot cure that ambiguity." *West Virginia*, 571 F. Supp. 3d at 1254. Likewise, on appeal, the Secretary's brief did not expressly argue that the rule could eliminate a constitutional problem with the Act. On the other hand, the Secretary relied extensively on her rulemaking power as a reason to reject the States' ambiguity challenge. For example, in the district court, the Secretary argued as a matter of justiciability that the regulation resolved the claims of the ten plaintiff States that had accepted the funds after she promulgated the interim final rule. Moreover, the States directly addressed this issue in their brief, arguing that the Secretary's rule could not cure the Act's constitutional infirmities.

Assuming that this argument was adequately raised, we cannot agree that the rule eliminates the constitutional problem with the Rescue Plan. This is so for two reasons.

First, we agree with the Sixth Circuit that we cannot be confident that Congress intended the agency to answer the questions the Act left open. *See Kentucky*, 54 F.4th at 353–54. The offset provision undoubtedly implicates questions of deep economic and political significance and alters the traditional balance of federalism by imposing a condition on a state's entire budget process. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991). As we have explained, because money is fungible, one reasonable interpretation of the offset provision is that it proscribes all tax cuts during the covered period. On that reading, the Act affects the states' sovereign authority to tax, *see McCulloch*, 17 U.S. (4 Wheat.) at 370, and "intrudes into an area that is the particular domain of state law," *see Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). The choice between that reading and a narrower one is a major question, such that Congress had to speak in a "specific and detailed" way if it intended to delegate the authority to answer that question. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 536 (2009) (Kennedy, J., concurring in part and concurring in the judgment) (quotation omitted).

But Section 802(f)—the delegation provision—says nothing about the executive agency's power to define the scope of the offset provision. Instead, Congress used the same kind of catchall delegation language in this Act that the Supreme Court held to be insufficient to delegate major questions in *King*. *See* 576 U.S. at 485–86. There, the statute at issue was 26 U.S.C. § 36B, which concerned

the availability of tax credits, *see King*, 576 U.S. at 485–486, and the delegation provision of that statute permitted the Secretary to "prescribe such regulations as may be necessary to carry out the provisions of [Section 36B]," 26 U.S.C. § 36B(h). Here, the Rescue Plan allows the Secretary to "issue such regulations as may be necessary or appropriate to carry out [the Act]." 42 U.S.C. § 802(f). If the availability of a tax credit is a major question that cannot be delegated by generic language, *see King,* 576 U.S. at 485–86, then the same is true for the way the offset provision applies to the States' budget process.

Second, an agency cannot exercise legislative power or otherwise "operate independently of the statute that authorized it." *FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022) (quotation omitted). The Constitution gives Congress, not the executive branch, the power to tax and spend through the exercise of its legislative power. It follows therefore that Congress, not an executive agency, must exercise that power constitutionally. As the Fifth Circuit explained in a similar case, "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021). Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted "would be inconsistent with the Constitution's meticulous separation of powers." *See id.* Therefore, the "needed clarity" under the Spending Clause "must come directly from the statute." *Id.* at 361.

In this respect, our conclusion that the offset provision does not impose an ascertainable condition is similar to a conclusion that it provides no intelligible principle to guide an agency. Congress can delegate power to an agency only if it "lay[s] down by legislative act an intelligible principle to which [the agency] . . . is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). When Congress does not provide an intelligible principle, an agency cannot cure the "unconstitutionally standardless delegation of power by declining to exercise some of that power." *Whitman*, 531 U.S. at 473. Instead, "[t]he very choice of which portion of the power to exercise—that is to say, the prescription of the standard that Congress had omitted—would *itself* be an exercise of the forbidden legislative authority." *Id.*

We think the ambiguity of the offset provision presents a similar problem. Just as an agency cannot choose its own intelligible principle, it cannot provide the content that makes a funding condition ascertainable. "There is an obvious difference between a statute stating the conditions upon which moneys shall be expended and one effective only upon assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced." *United States v. Butler*, 297 U.S. 1, 73 (1936).

To be clear, we do not question an agency's authority to fill in gaps that may exist in a spending condition. The Supreme Court has explained that, when a state accepts federal funds, the state necessarily agrees "to comply with, and its liability is determined by, the legal requirements in place when the grants were made."

*Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985). These "legal requirements" include existing regulations. *See id.* But the problem we confront here is not whether Congress left a gap that an agency may fill; it is the lack of an ascertainable condition in the statute. The Constitution does not allow the Secretary to "suppl[y] content without which the Offset Provision literally could not function." *Kentucky*, 54 F.4th at 354. Even assuming an agency can resolve some ambiguity in a funding condition, the condition itself must still be ascertainable on the face of the statute.

### C.

Because we hold that the condition imposed by the Rescue Plan's offset provision violates the Spending Clause for its lack of ascertainability, we need not address the States' coercion and Tenth Amendment claims. But we must still decide whether the district court abused its discretion in permanently enjoining enforcement of the offset provision.

After finding a statute unconstitutional, we must ask whether "the legislature [would] have preferred what is left of its statute to no statute at all." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006). When striking unconstitutional provisions, we must "refrain from invalidating more of the statute than is necessary." *United States v. Booker*, 543 U.S. 220, 258 (2005) (quotation omitted). And we must retain the sections "that are (1) constitutionally valid, (2) capable of 'functioning independently,' and (3) consistent with Congress' basic objectives in

enacting the statute." *Id.* at 258–59 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)) (citations omitted). Everyone agrees that the offset provision is severable from the rest of the Act, and we accept the parties' concession on this point.

To obtain a permanent injunction, the moving party must show that (1) it has suffered irreparable harm; (2) remedies at law will not provide adequate compensation for the injury; (3) on balance, an equitable remedy is warranted; and (4) a permanent injunction will not disserve the public interest. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008). The district court can exercise "a range of choice" when deciding whether to grant a permanent injunction, so long as it does not misapply legal standards or rely on clearly erroneous facts. *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1257 (11th Cir. 2014) (quotation omitted). Applying this standard, the district court did not abuse its discretion in concluding that a permanent injunction is warranted.

First, the States have suffered irreparable harm. The Rescue Plan's offset provision has affected the States' sovereign authority to tax by binding them to a deal with ambiguous terms and placing them on the hook for billions of dollars in potential recoupment actions. Second, money damages cannot adequately compensate the States because the federal government generally enjoys immunity from suit. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). Third, the States' inability to promulgate their own tax policies—and the attendant financial consequences—outweigh any

inconvenience to the Secretary from the district court's injunction. Fourth, the injunction serves the public interest. Enforcing the Spending Clause's limitations helps preserve state sovereignty and the "two-government system established by the Framers." *NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.). Allowing Congress to run roughshod over the States' sovereign rights would threaten dual sovereignty and would be a step toward "vest[ing] power in one central government." *Id.*

All four elements weigh in favor of granting a permanent injunction. The district court did not misapply the law nor base its determination on clearly erroneous facts. It did not abuse its discretion. We also agree with the district court that the permanent injunction fully redresses the States' harm in this case—declaratory relief is unnecessary. We reiterate, however, that the permanent injunction applies *only* to Section 802(c)(2)(A), which is severable from the remaining provisions of the Act.

## IV.

The district court is **AFFIRMED.**