# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 25, 2024

Lyle W. Cayce
Clerk

No. 22-10560

STATE OF TEXAS; STATE OF MISSISSIPPI; STATE OF LOUISIANA,

*Plaintiffs—Appellees*,

*versus*

JANET YELLEN, *in her official capacity as Secretary of the Treasury*; RICHARD K. DELMAR, *in his official capacity as Acting Inspector General of the Department of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; UNITED STATES OF AMERICA,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:21-CV-79

Before ELROD, HO, and OLDHAM, *Circuit Judges*.

JENNIFER WALKER ELROD, *Circuit Judge*:

The American Rescue Plan Act allocated nearly $200 billion to the states and the District of Columbia to assist with economic recovery in the wake of the COVID-19 pandemic. But the funds came with a catch. To accept the money, states had to agree not to use it to "directly or indirectly offset" reductions in state tax revenue. Several states filed a lawsuit seeking to enjoin the enforcement of that provision.

No. 22-10560

In exercising its power under the Spending Clause, Congress has a constitutional obligation to cut a clear deal with the states when they accept federal funding. Because the challenged provision is not clear about what it requires of the states, it falls short of that obligation and is impermissibly ambiguous. Accordingly, we reach the same ultimate conclusion as have two other circuit courts and AFFIRM the district court's grant of a permanent injunction.

I

Congress enacted the American Rescue Plan Act in March 2021 in the wake of profound economic damage caused during the COVID-19 pandemic. Pub. L. No. 117-2, § 9901(a), 135 Stat. 4 (2021) (codified at 42 U.S.C. § 801 *et seq.*). As one of its many provisions, ARPA allocates $195.3 billion to the states and the District of Columbia to aid their economic recovery, and these funds can be used to cover a range of costs. 42 U.S.C. §§ 802(b)(3)(A), (c)(1). However, ARPA also imposes a condition on the states' acceptance of their allotted share. Section 802(c)(2)(A) provides that:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 803(c)(4) of this title to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

In other words, ARPA broadly prohibits states from using their ARPA funds to take any action that would reduce their net tax revenue.

Before receiving the funds, a state must certify that it will comply with the restrictions imposed by Section 802(c). *Id.* § 802(d)(1). After accepting the funds, states must continue to provide "a detailed accounting" of both

2

how their funds are used and what "modifications" they make "to the State's or territory's tax revenue sources." *Id.* § 802(d)(2). A state that accepts funds and subsequently fails to abide by Section 802(c)(2)(A) "shall be required to repay to the Secretary [of the Treasury] an amount equal to the amount of funds used in violation [thereof]." *Id.* § 802(e).

ARPA also authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out" the applicable statutory provisions. *Id.* § 802(f). In May 2021, the Secretary published an interim final rule. *Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26786 (May 17, 2021). The Treasury Department released a final rule in January 2022. *Coronavirus State and Local Fiscal Recovery Funds*, 87 Fed. Reg. 4338 (Jan. 27, 2022). According to Treasury, the regulations interpret Section 802(c)(2)(A) to prohibit states only from cutting tax *revenue* and then using ARPA funds to account for that revenue cut, rather than using "organic economic growth, increases in revenue from other sources, or spending cuts" that are unrelated to where the state is putting their federal funds.

In May 2021, shortly before Treasury released its interim final rule, the states of Texas, Louisiana, and Mississippi sued the named federal defendants in the Northern District of Texas. The States challenged Section 802(c)(2)(A)'s constitutionality and requested declaratory and injunctive relief. The funds that ARPA allocates to Texas, Louisiana, and Mississippi amount to 13%, 7%, and 31%, respectively, of each state's 2021 budget.

The federal defendants moved to dismiss the lawsuit for lack of standing, but the district court denied their motion. The States moved for

summary judgment on three of their claims.[1] First, that Section 802(c)(2)(A) violated the Spending Clause because it created an unlawfully coercive condition. Second, that Section 802(c)(2)(A) was unconstitutionally ambiguous and unrelated to the purposes of ARPA. Third, that Section 802(c)(2)(A) violated the anticommandeering doctrine by forcing states to adopt certain tax laws. The federal defendants also moved for summary judgment.

The district court granted summary judgment in favor of the States, determining that "Congress's offer of ARPA funds in exchange for acceptance of Section 802(c)(2)(A) is unduly coercive and commandeers Plaintiffs." The court found Section 802(c)(2)(A) unduly coercive because the amount of money at stake was too great to present the States with a real choice. The billions of dollars on the table acted not as a genuine offer but as a "gun to the head" given the States' acute need for funding in response to financial pressures caused by the pandemic. And the court found that Section 802(c)(2)(A) violated the anticommandeering doctrine by unlawfully forcing the States to adopt certain tax policies. The district court held that because "there is no power more central to state sovereignty than the power to tax," the "federal government exceeds its authority when it unduly influences a State's power to set its own tax policies." The district court did not reach the States' other arguments.

Having ruled in the States' favor, the district court permanently enjoined the enforcement of Section 802(c)(2)(A). It denied the States' request for declaratory relief because the injunction already remedied their ongoing harm. The federal defendants timely appealed. They argue that the

---

[1] The States' complaint included a fourth claim that Section 802(c)(2)(A) violated the principle of equal sovereignty between the states and the federal government, but the States did not include this claim in their motion for summary judgment.

district court erred in holding that the State plaintiffs had standing to bring the suit, so the district court was without jurisdiction to reach the merits. And they argue that even if the district court did have jurisdiction, it erred in enjoining enforcement of Section 802(c)(2)(A).

## II

We review rulings on standing *de novo*. *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1083 (5th Cir. 2022). We review the district court's grant of a permanent injunction for abuse of discretion, and "the legal issues underlying the grant of the injunction *de novo*." *Med-Cert Home Care, L.L.C. v. Becerra*, 19 F.4th 828, 830 (5th Cir. 2021). And "we may affirm for any reason supported by the record, even if not relied on by the district court." *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009).

## III

The federal defendants argue on appeal that the States lack standing. We disagree.

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citation omitted). The federal defendants do not contest the traceability and redressability requirements of standing, which are easily met here. The States' alleged injuries—their being coerced and commandeered by Section 802(c)(2)(A)—are directly traceable to the federal defendants who are responsible for enforcing it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And the injunction against Section 802(c)(2)(A)'s enforcement is "a sanction that effectively abates that conduct and prevents its recurrence," thereby

"provid[ing] a form of redress." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185–86 (2000).

Instead, the federal defendants contest only whether the States' alleged injuries are sufficiently concrete to satisfy the requirements of standing. "A concrete injury must be *de facto*; that is, it must actually exist," and it must be "real" rather than "abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (internal quotation marks and citations omitted). We consider the "nature and source of the claim asserted," not the merits of whether the plaintiff's legal theory is correct. *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . ."). This means that we assume that the plaintiff's interpretation of a challenged statute is correct before examining whether the alleged harms—posited to be real—are cognizable injuries. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (assuming that the plaintiffs' interpretation of the relevant statute was correct when undertaking standing analysis).

Here, assuming that the States' interpretation of ARPA is correct, they have suffered at least two concrete injuries. First, ARPA coerces them into making a choice between losing potentially billions of dollars or surrendering their ability to set state tax policy.

The Supreme Court has "repeatedly characterized Spending Clause legislation as 'much in the nature of a *contract*.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–77 (2012) (*NFIB*) (internal ellipses and citation omitted). Coercion in the bargaining process is a familiar injury—the "denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result." *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998). Here, according to the States' interpretation of ARPA, they stand to forego either billions of dollars in federal funds by rejecting the

government's offer, or their authority over taxation by accepting it. As the district court observed, the States "face possible harm whichever choice they choose." This is not so much a choice as it is a double bind.

Not surprisingly, the Supreme Court has exercised jurisdiction over disputes in which states allege that the federal government is unlawfully using its Spending Clause powers to coerce the states into accepting conditional offers. *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 205 (1987). So too have other circuit courts that have already confronted state-mounted challenges to Section 802(c)(2)(A). *West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023); *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022) ("States have standing when an allegedly unconstitutional funding offer is made to them . . . .").

Second, the States face injury from the threat of a future recoupment proceeding pursuant to Section 802(e). A plaintiff has met the injury-in-fact requirement for standing under a pre-enforcement theory where it: "(1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest' (2) [its] intended future conduct is 'arguably . . . proscribed by [the law in question],' and (3) 'the threat of future enforcement of the [challenged law] is substantial.'" *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014)).

The Eleventh Circuit has persuasively explained why state plaintiffs challenging Section 802(c)(2)(A) suffer an injury-in-fact under this pre-enforcement theory. For starters, "[t]here is no question that the States intend to continue cutting taxes and modifying their overall revenue." *West Virginia ex rel. Morrisey*, 59 F.4th at 1137. Here, the States aver as they did before the district court that they will continue, as all states do, to set their

own tax policy, including by cutting taxes.[2]   This conduct implicates an authority "central" to the federal structure outlined in the Constitution.  *See Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994).

Because the States accepted the condition imposed by Section 802(c)(2)(A), some exercises of this taxing authority are "arguably" proscribed.  Should the States nonetheless choose to exercise such authority in violation of Section 802(c)(2)(A), they will be subject to a recoupment action under Section 802(e).  The States argue that they are unable to accurately guess what exactly Section 802(c)(2)(A) prohibits and must therefore budget under a Sword of Damocles—guess correctly, or retroactively lose federal funding.  Therefore, "[t]he only way for the States to achieve unequivocal compliance with the Act is to refrain from cutting taxes during the covered period."  *West Virginia ex rel. Morrisey*, 59 F.4th at 1138.

And there is a "substantial" threat of future enforcement, as Section 802(e)'s requirement is mandatory.  42 U.S.C.  § 802(e) (a state violating Section 802(c)(2)(A) "shall be required to repay" ARPA funds so used).  Although Treasury's subsequent regulations adopted a narrow construction of Section 802(c)(2)(A)'s prohibition, the regulations still contemplate recoupment of funds from the states.  *Arizona*, 34 F.4th at 850 (9th Cir. 2022) (citing 31 C.F.R. § 35.10); *see also West Virginia ex rel. Morrisey*, 59 F.4th at 1137 (citing *Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. at 26808).  The States therefore have "an actual and well-founded fear that the law will be enforced against them."  *Driehaus*, 573 U.S. at 160.

---

[2] That being said, as the district court correctly noted, "a violation of Section 804(c)(2)(A) is not a prerequisite to standing."  *See also Driehaus*, 573 U.S. at 163.

No. 22-10560

The federal defendants raise several additional arguments against standing, but each fail. First, they cite the Eighth Circuit's opinion in *Missouri v. Yellen*, 39 F.4th 1063 (8th Cir. 2022). In that case, the Eighth Circuit held that Missouri lacked standing to challenge Section 802(c)(2)(A) because it did not "challeng[e] the [provision] as written, but rather a specific potential interpretation of the provision—the 'broad interpretation.'" *Id.* at 1069. But the *Missouri* case is inapposite here. In fact, the Eighth Circuit expressly distinguished Missouri's lawsuit from a similar suit brought by Arizona in the Ninth Circuit, where that court held that Arizona had standing. In the Ninth Circuit case, Arizona "argued that, *as written*, the Offset Restriction is unconstitutionally ambiguous and unduly coercive." *Id.* at 1069 n.5 (citing *Arizona*, 34 F.4th at 852). Here, the States press the same argument as did Arizona.

Next, the federal defendants argue that the canon of constitutional avoidance should guide our interpretation of Section 802(c)(2)(A). They assert that "it would have been appropriate to construe the Offset Provision narrowly in order to avoid any serious constitutional issues that would have arisen from a different construction." But this touches on the merits of the States' claims, which we do not reach when examining standing. *Warth*, 422 U.S. at 500.[3] We assume that the States' reading of the challenged statute is the correct one. *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 392.

---

[3] To the extent that constitutional avoidance might be implicated as to the merits, we note that it is of no relevance as to the States' claim arising from the Spending Clause's clarity requirement, examined below. "[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 494 (2001). Therefore, this canon cannot apply to resolve ambiguous conditions imposed through the spending power, where the entire constitutional question is whether the condition is ambiguous in the first place. *See Dole*, 483 U.S. at 207. To apply that canon here would be to essentially reason that, given Section 802(c)(2)(A)'s ambiguity, we should interpret it to be unambiguous. But constitutional

No. 22-10560

Finally, the federal defendants also contend that whatever injury the States may have feared suffering from the face of the statute, those fears have since been "put to rest" by the Treasury's subsequent regulations. We do not read this as a true standing argument, however, as this litigation predates the issuance of those regulations. *See Friends of the Earth*, 528 U.S. at 189 (standing inquiry examines plaintiff's interests at the commencement of litigation); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); *Pool v. City of Houston*, 978 F.3d 307, 312 (5th Cir. 2020) (same). Rather, this argument sounds in mootness. *Friends of the Earth*, 528 U.S. at 189. A case becomes moot when it becomes "impossible for the court to grant any effectual relief whatever to a prevailing party." *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (internal quotation marks and citation omitted).

The problem for the federal defendants is that the States' injuries remain even if their magnitude is reduced. Enjoining enforcement of the statute to which they mount a constitutional challenge is not suddenly ineffectual just because the States are on the hook for less money, and their sovereign powers are less constrained. *See id.* As the Eleventh Circuit stated when confronting this exact argument, "[w]e see no basis in mootness doctrine to conclude that the Secretary's willingness to provide a lesser remedy (a narrower construction) to address the States' constitutional challenge moots the States' request for a more substantial remedy (facial invalidation)." *West Virginia ex rel. Morrisey*, 59 F.4th at 1139; *see also Kentucky v. Yellen*, 54 F.4th 325, 363 (6th Cir. 2022) (Nalbandian, J.,

_____

avoidance is a means of choosing between multiple possible meanings, not of asserting that there was one clear meaning all along. We therefore "do not find guidance in this avoidance principle." *See Oakland Cannabis Buyers*, 532 U.S. at 494.

10

No. 22-10560

concurring in part and dissenting in part) ("[T]he regulation does not fix [Section 802(c)(2)(A)] in three other ways: Vagueness still exists from ARPA's lack of explanation on how to (1) calculate a 'reduction' in net tax revenue, (2) determine whether such a reduction resulted from a tax cut, and (3) tell what particular conduct constitutes an 'indirect' offset."). And the question whether Treasury's regulations can cure an unconstitutionally vague statutory funding condition in the first place is itself vigorously disputed between the parties.

Having concluded that the States have standing to challenge the enforcement of Section 802(c)(2)(A), and that their challenge is not moot, we proceed to evaluate its merits.

IV

A

The federal government is one of limited power in our constitutional structure. "The constitution confers on Congress not plenary legislative power but only certain enumerated powers." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018). The People and the states retain all else. U.S. Const. amend. X. "[C]onspicuously absent" from Congress's enumerated powers is the ability to order the state governments to enact legislation or policies to the federal government's liking. *Murphy*, 584 U.S. at 471.

Congress may, however, dictate how states spend federal dollars so long as such directives are consistent with state sovereignty. The Spending Clause grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds[.]" *Dole*, 483 U.S. at 206. In *Dole*, the Supreme Court held that

11

Congress had permissibly employed "relatively mild encouragement to the States to enact higher minimum drinking ages" by conditioning "5% of the funds otherwise obtainable under specified highway grant programs" on the states' enacting such laws. *Id.* at 211.

But Congress may not use its spending power to functionally commandeer the states.[4] It may not coerce the states into accepting federal grant programs by presenting offers that are, for practical purposes, impossible to refuse. *NFIB*, 567 U.S. at 581; *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (a state must "*voluntarily* and knowingly accept[]" a grant of funds made under the Spending Clause (emphasis added)). In *NFIB*, for example, the Supreme Court examined a provision in the Affordable Care Act providing that if a state opted out of the Act's expansion of healthcare coverage, the state could lose all future Medicaid funding. 567 U.S. at 581 (Roberts, C.J., joined by Breyer & Kagan, JJ.). Numerically, this would amount to a threatened loss of "over 10 percent of a State's overall budget." *Id.* at 582. This "economic dragooning" was impermissibly coercive and therefore unconstitutional. *Id.*

The point at which permissible inducement crosses over to impermissible coercion is not always easy to discern under the Supreme Court's precedent, but it lies somewhere between *Dole* and *NFIB*. If the States are correct that Section 802(c)(2)(A) conditions ARPA funds on the

---

[4] The anticommandeering doctrine and the limits of Congress's spending powers are distinct constitutional protections safeguarding our system of dual federalism. In this case, however, they are interwoven. As the district court noted, "both the Spending Clause and Tenth Amendment require the Court to ask whether the challenged 'provision is inconsistent with the federal structure of our Government established by the Constitution.'" A coercive offer is, after all, virtually the same as a command. Therefore, a conditional grant of funding can violate both the Spending Clause and the anticommandeering doctrine by operating as a command to the states to adopt certain policy objectives that Congress could not otherwise pursue.

States' signing away their ability to reduce taxes, and that ARPA funding is so vital for state budgets as to be impossible to refuse, then Congress has indeed impermissibly used the Spending Clause to bootstrap a federal power alien to our constitutional scheme: the power to decide state tax policy. However, we note that there is some reason to be skeptical of the district court's statement that "the States must choose whether to surrender their sovereignty or forgo billions of dollars in federal funds." This is because unlike the provision at issue in *NFIB*, Section 802(c)(2)(A) operates to require repayment only of the difference between offset reductions in tax revenue and total ARPA funding, not the entire sum of ARPA funding. 42 U.S.C. § 802(e).

The parties' disagreement also turns on a more fundamental question of framing. On the one hand, if Section 802(c)(2)(A) is merely a condition on the spending of ARPA funds themselves, then it simply "ensures that the funds are spent according to Congress's view of the 'general Welfare,'" and is not unconstitutionally coercive. *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183 (5th Cir. 2020) (quoting *NFIB*, 567 U.S. at 580). In this telling, Section 802(c)(2)(A) acts like a "maintenance-of-effort" provision that requires a state to continue spending whatever amount it was already spending in the area that it is receiving the grant. For example, a state that spends $20 million on education and receives a $10 million education grant with a maintenance-of-effort provision would be required to continue spending $20 million of its own funds on education to accept the grant. *See, e.g.*, *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 659 (1985) ("In order to assure that federal funds would be used to support additional services that would not otherwise be available, the Title I program . . . prohibited the use of federal grants merely to replace state and local expenditures.").

On the other hand, if Section 802(c)(2)(A) is so expansive as to require the States to accept policy changes, then it triggers the coercion analysis. Congress could not impose on the States a policy forbidding all tax cuts. And Section 802(c)(2)(A) is no typical "maintenance-of-effort" provision. It does not hold state *expenditures* constant; it governs state *revenues*. As the district court correctly pointed out, "[n]either ARPA nor Section 802(c)(2)(A) prohibit a State from replacing state expenditures with ARPA funds."

The difference in perspective comes from the tricky fact that "[m]oney is fungible." *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010). We need not decide here, however, who has the better argument. Section 802(c)(2)(A) fails constitutional muster for the related but much simpler reason that the condition it imposes is impermissibly ambiguous. In short, the district court held that Section 802(c)(2)(A) was unconstitutional because it "prohibits tax cuts altogether." We, however, hold that it is unconstitutional because it *might*. The States are unable to tell one way or the other. In so holding, we embrace in full the reasoning of the Eleventh Circuit, which has already confronted a similar challenge to Section 802(c)(2)(A). *See West Virginia ex rel. Morrisey*, 59 F.4th at 1140.[5]

B

Return to the Spending Clause. As explained above, the conditions that Congress attaches to federal grants may not have the *effect* of functionally commandeering the states. But the Supreme Court has also outlined "restrictions" on the *manner* in which such conditions may be

---

[5] We note that in a January 26, 2024, letter to Congress, the United States Department of Justice disclaimed any intention to seek Supreme Court review of the Eleventh Circuit's opinion in *West Virginia ex rel. Morrisey*.

constitutionally imposed. *Dole*, 483 U.S. at 207. Such conditions must: (1) "be in pursuit of the general welfare"; (2) be unambiguous, "enab[ling] the States to exercise their choice knowingly, cognizant of the consequences of their participation"; (3) not be "unrelated 'to the federal interest in particular national projects or programs'"; and (4) not be independently barred by "other constitutional provisions." *Id.* at 207–08 (internal quotation marks and citation omitted).

The second restriction—the clarity requirement—is in play here. The States argue that Section 802(c)(2)(A) "is ambiguous as to its scope."[6] Therefore, they argue, they are unable to knowingly exercise their choice to accept ARPA funding.

"[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17. This requirement is rooted in the observation that congressional exercises of the spending power can operate "much in the nature of a contract," where states bind themselves to comply with federally imposed conditions in return for federal funding. *Id.* "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.*; *see also NFIB*, 567 U.S. at 676 (Scalia, J., dissenting) ("[A]ny such conditions must be unambiguous so that a State at least knows what it is getting into.").

---

[6] The States also make a related claim that the provision is "far too overinclusive *and* underinclusive to bear any reasonable relationship to any legitimate purpose underlying the Act's funding provisions." We need not reach this argument and, like the district court, decline to do so.

Naturally, for a state's acceptance to be knowing, the terms to which it agrees must be knowable.

At the threshold, the federal defendants dispute the applicability of the *Pennhurst-Dole* clarity requirement. They argue that the requirement is merely a clear-statement rule applied as a "tool of statutory interpretation" that cannot render statutory provisions "categorically unenforceable because they [are] ambiguous in certain respects." In other words, they argue that the test is applied to answer whether a condition *exists*, not whether, a condition being present, it is *enforceable* as a constitutional matter. Because the offset provision undoubtedly imposes a condition, so the argument goes, the clarity requirement is not implicated.

We do not believe that this account of *Dole* and *Pennhurst* is tenable. First, *Dole* gave no indication that any of the four constitutional "requirements" and "limitations" that "restrict[ed]" the bounds of Congress's spending power were mere rules of statutory construction. *Dole*, 483 U.S. 207–08 (explaining that conditions may be rendered "illegitimate" for example, if unrelated to federal interests); *see also id.* at 213 (O'Connor, J., dissenting) (agreeing with the majority that "there are four separate types of *limitations* on the spending power," one of which is that "the conditions imposed must be unambiguous" (emphasis added)). The Supreme Court nowhere suggested that a hierarchy existed between any of these "limitations," each of which is "equally important and equally required." *West Virginia ex rel. Morrisey*, 59 F.4th at 1142. We see no reason to treat the clarity requirement any differently. While *Pennhurst* does contain some language helpful to the federal defendants' reading—for example, that clarity is particularly important when a state's obligations are "largely indeterminate," 451 U.S. at 25—the Supreme Court still counseled that a condition would be impermissibly ambiguous if a state is "unable to ascertain what is expected of it." *Id.* at 17.

Second, *Dole* and *Pennhurst* are explicit in relying on principles of contract in explaining the limitations on the spending power. So, contract law provides a useful analog here. As the Eleventh Circuit observed, "the problem of indefiniteness is not always a mere issue of construction . . . ; it may go to the validity of the contract itself." *West Virginia ex rel. Morrisey*, 59 F.4th at 1143 (citing Restatement (Second) of Conts. § 33 cmt. a). *Pennhurst* confirms that the clarity requirement goes to that question of validity. The Supreme Court explained in that case that "[t]he *legitimacy* of Congress' power to legislate under the spending power [] rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17 (emphasis added). If ambiguity makes knowing acceptance impossible, then the condition is unenforceable, and the bargain is invalid.

Finally, the federal defendants' account of the *Pennhurst-Dole* clarity requirement would lead to questionable results. If all that the requirement does is ensure that a condition be unambiguously mandatory and not hortatory, then it seems inevitable that any number of mandatory but content-less conditions could be imposed on the states. Take a hypothetical statute passed by Congress that provides modest funding to the states to invest in their healthcare infrastructure. But as a condition of receiving those funds, the states must agree that "no portion of these funds shall be used to advance injustice," subject to a recoupment provision. "Injustice" in such a context has no discernable content. It is hopelessly ambiguous, far more so than the putative command at issue in *Pennhurst* to provide "appropriate treatment" to the intellectually disabled in the "least restrictive" setting. *Id.* at 25. But the condition, whatever it means, is indisputably mandatory. Any future administration could fill in its expansive contours with whatever requirements that the administration sees fit, and which the states could have never anticipated. Are we to believe that the Spending Clause's clarity

requirement has nothing to say about such a provision, which could be interpreted in any number of divergent—indeed, mutually exclusive—ways? We think that such a condition must be unconstitutionally ambiguous.

It is true, as the federal defendants point out, that the Sixth Circuit has reached a slightly different conclusion, even though it ultimately sided with the state plaintiffs in that case on the merits.[7] That court observed that "Congress does not necessarily lack the constitutional *power* to enact vague spending laws in the same way that, for instance, it lacks the power to enact a law respecting an establishment of religion." *Kentucky*, 54 F.4th at 347 (internal quotation marks and citations omitted). Therefore, "strictly speaking," Section 802(c)(2)(A) "is not 'unconstitutional' under the Spending Clause." *Id.* But we think that the better framing is that Congress lacks the constitutional power—not to enact vague spending laws—but to *impose mandatory conditions* through the enactment of vague spending laws. Any attempt to do so is *ultra vires* and the corresponding law is unconstitutional under the Spending Clause. We therefore join the Eleventh Circuit in holding that the *Pennhurst-Dole* clarity requirement "is a binding constitutional command," imposing a constitutional bar on ambiguous spending conditions and providing grounds for an injunction against the enforcement of such conditions. *West Virginia ex rel. Morrisey*, 59 F.4th at 1142–43.

Continuing to fight the clarity requirement's application here, at oral argument the federal defendants pointed to *Biden v. Missouri*, in which the Supreme Court upheld the authority of the Department of Health and

---

[7] The Sixth Circuit held that Section 802(c)(2)(A) did not clearly explain how to identify a tax offset, and, therefore, were a state to "engage in conduct Treasury deems a violation of the Offset Provision, Treasury may not initiate enforcement proceedings in response." *Kentucky*, 54 F.4th at 347.

Human Services to require medical facilities to enforce vaccination requirements on covered staff as a condition of receiving Medicare and Medicaid funds. 595 U.S. 87, 91 (2022). The relevant statute authorized the Secretary to promulgate "as a condition of a facility's participation in the programs . . . requirements as [he] finds necessary in the interest of the health and safety of individuals who are furnished services." *Id.* at 90 (internal quotation marks and citation omitted) (alteration in original). The federal defendants take this to mean that Congress may delegate the task of fleshing out the details of a funding condition, and that the statute itself need not contain all those details to be valid.

But *Biden v. Missouri* was not a case about the *Pennhurst-Dole* clarity requirement. Nowhere did the Supreme Court's opinion cite either of those two earlier cases, and for good reason. The dispute in *Biden v. Missouri* did not arise from the imposition of potentially ambiguous spending conditions on state governments. Rather, the question that the Supreme Court confronted was whether the HHS's vaccination rule, imposed on healthcare facilities and providers, "fit[] neatly within the language of the statute." *Id.* at 92. A majority of the Court answered that it did, holding as a matter of statutory interpretation that Congress had authorized HHS to impose such "infection control measures" on facilities that received federal funds. *Id.* at 95–96.

Here, by contrast, the statute at issue itself raises an entirely different question: whether Congress has impermissibly imposed an ambiguous condition on the States' use of federal funds. We conclude that it has, for two reasons.

The first problem is with the phrase "directly or indirectly offset." Section 802(c)(2)(A) prohibits states from using ARPA funds to "either directly or indirectly offset a reduction in the net tax revenue of such State or

territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax." The States aptly point out that if the federal defendants are indeed correct that Section 802(c)(2)(A) excludes at least some tax reductions, then there must be a line separating such permissible reductions from reductions that ARPA funds "directly or indirectly offset." Where that line lies, however, is not clear from the face of the statute.

The issue primarily stems from the capacious meaning of the term "indirectly." Take as an example a state with $20 billion in annual tax revenue that receives $10 billion in ARPA funding. If that state spends those ARPA funds permissibly and then alters its tax regime such that its annual tax revenue is reduced to $15 billion, Treasury might conclude that the state is using $5 billion in ARPA funding to indirectly offset that loss. This is true even if the state altered its tax regime for completely unrelated reasons, as Section 802(c)(2)(A) takes no account of the motivation behind the measures that result in lost tax revenue. Treasury might argue that but for the state's ARPA funding, the state would not have restructured its tax regime in the way that it did.

Indeed, even Treasury Secretary Janet Yellen, in a hearing before Congress, was unable to offer any clarification, stating that the effect of Section 802(c)(2)(A) would be hard to predict "given the fungibility of money." *The Quarterly CARES Act Report to Congress: Hearing Before the Sen. Comm. on Banking, Hous. & Urb. Affairs*, 117th Cong. 18 (Mar. 24, 2021) (statement of Janet L. Yellen, Secretary, Department of the Treasury). Secretary Yellen also admitted that this issue raises a "host of thorny questions." *Id.*

Courts across the country have likewise struggled. *See, e.g.*, *Ohio v. Yellen*, 539 F. Supp. 3d 802, 818 (S.D. Ohio 2021) ("Despite poring over this

statutory language, the Court cannot fathom what it would mean to 'indirectly offset a reduction in the net tax revenue' of a State, by a 'change in law . . . that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise).'" (omission in original)). And turning to dictionary definitions offers no help in coloring the boundaries of these "extraordinarily expansive" statutory terms. *West Virginia ex rel. Morrisey*, 59 F.4th at 1144–45 (citing Oxford English Dictionary (online ed. Dec. 2022)); *see also Kentucky*, 54 F.4th at 348 (citing Webster's New International Dictionary 1267 (2d ed. 1960) and Compact Edition of the Oxford English Dictionary 1418 (1971)).

The second problem is the failure to identify a baseline against which any revenue reductions will be measured. Section 802(c)(2)(A) thereby sets no standard by which the States can measure whether they are in compliance. As the States point out, the very premise of reducing "net tax revenue" means that there must be some prior level from which revenue is reduced. A prohibition on such a reduction "presupposes a baseline against which to measure" it. *West Virginia ex rel. Morrisey*, 59 F.4th at 1144. ARPA's "lack of a baseline affects whether a state policymaker can understand and comply with the statute." *Id.*

Return to the hypothetical $20 billion-revenue state. Only now, we cannot even say with certainty what its revenue is for purposes of Section 802(c)(2)(A). Let us suppose that the $20 billion figure was its tax revenue for 2020. But in 2019, its revenue was closer to $15 billion. Depending on which year Treasury uses as the baseline, the state could be on the hook for $0 (if 2019 is used), $5 billion (if 2020 is used), or anything in between, depending again on how Treasury interpreted "indirectly offset."

Even if a temporal baseline could be divined from the otherwise silent text, a numerical standard would still be absent. As the Sixth Circuit

explained, ARPA "never specifies whether it prohibits a reduction in *expected* tax revenues, which a state would be able to control *ex ante*, or whether it prohibits a reduction in *actual* tax revenues, which a state could potentially determine only *ex post*." *Kentucky*, 54 F.4th at 351. By what accounting metric are states supposed to know whether they have impermissibly lowered tax revenue in violation of Section 802(c)(2)(A)? And should states be looking at pre-pandemic revenues, mid-pandemic revenues, or post-pandemic revenues? Given the extreme economic disruptions caused by the COVID-19 pandemic—indeed, the very disruptions ARPA was meant to address—one can expect the time period chosen to have a major impact on the ultimate amount of funding for which states could be on the hook. At oral argument the federal defendants acknowledged that, at least on the face of the statute, ARPA does not answer this question.

These questions inject such uncertainty into the enforcement of the statute that the states are prevented from knowing the terms of the deal that they are agreeing to. The likely upshot is that Section 802(c)(2)(A) will discourage states from cutting taxes, lest they find themselves caught within the provision's uncertain scope. The Constitution prohibits this use of the spending power.

Stepping back, it is helpful to compare the statutory provision here to the one at issue in *Dole*. That case examined a clear condition on federal funds: states could either raise their legal drinking age to 21 or lose 5% of their federal highway funding. Every state knew what it was signing up for when it chose to either decline or acquiesce in the bargain because each side of the equation was obvious. *Dole*, 483 U.S. at 211. But here, neither is. When does a state tax cut violate Section 802(c)(2)(A) and trigger an obligation to repay the federal government under Section 802(e)? And because there is no clear baseline revenue to measure such reduction, how much must be paid back?

There is no clarity to this bargain. There is only the bureaucrat's abacus, usable only by the offeror and invisible always to the offeree.

The federal defendants proceed to argue that any ambiguity has been eliminated by Treasury's subsequent regulations. But the regulations are of no help. In arguing that *statutory* ambiguity can be vitiated by *regulatory* enactments in the context of the Spending Clause, the federal defendants claim a remarkably broad power for federal administrative agencies. But this claim is remarkably wrong.

As we have previously explained:

> [W]hen Congress places conditions on the States' receipt of federal funds, it must do so unambiguously . . . . Regulations that interpret statutes are valid only if they either match Congress's unambiguous command or are clarifying a statutory ambiguity. Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of *Dole.*

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) (internal quotation marks and citation omitted); *cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 458 (2001) ("An agency cannot cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute."). In other words, regulations cannot divest a statute of the very feature that permitted those regulations in the first place.

The promulgated regulations thus suffer from an inescapable dilemma. They are legally relevant if and only if the statute is ambiguous. *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 963 (5th Cir. 2023). But if the statute is ambiguous, then it violates the Spending Clause. *Pennhurst*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

Therefore, the regulations cannot aid the federal defendants in saving the statute's constitutionality. Indeed, in leaning so heavily throughout their argument on the clarifications provided by the regulations instead of the clarity contained within the statutory text, the federal defendants implicitly reveal the fatal ambiguity that infects Section 802(c)(2)(A).

V

Having found that Section 802(c)(2)(A) violates the Spending Clause, we now turn to examine the remedy that the district court granted. We must determine whether permanently enjoining enforcement of Section 802(c)(2)(A) was an abuse of discretion. We hold that it was not. In so doing, we follow the lead of both the Sixth and Eleventh Circuits in affirming permanent injunctions against Section 802(c)(2)(A)'s enforcement against state plaintiffs. *Kentucky*, 54 F.4th at 348 (affirming injunction as to the state of Tennessee); *West Virginia ex rel. Morrisey*, 59 F.4th at 1149.

First, we address severability. "After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006). At oral argument, counsel for the federal defendants stated that Congress would have meant to provide states with Fiscal Recovery Funds even without Section 802(c)(2)(A). And even absent Section 802(c)(2)(A), "[t]he remainder of the Act 'function[s] independently.'" *See United States v. Booker*, 543 U.S. 220, 259 (2005) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)). No one has argued that ARPA rises and falls with the validity of that provision. Section 802(c)(2)(A) is severable. *West Virginia ex rel. Morrisey*, 59 F.4th at 1149 (holding the same).

A party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as

No. 22-10560

monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

For the reasons stated by the district court, we agree that the States have made that requisite showing. The States' injuries are irreparable because Section 802(c)(2)(A) impacts their sovereign authority over tax policy. Money damages are inadequate because the federal government is generally entitled to sovereign immunity against such lawsuits. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). The balance of hardships favors the States, as losing sovereign authority is a far greater inconvenience than losing the ability to recoup ARPA funds. And the public interest is clearly served by enjoining unconstitutional exercises of Congress's spending power and preserving the federal character of our constitutional structure.

* * *

For these reasons, we AFFIRM the district court's grant of a permanent injunction.