**Affirmed in part and Reversed and Rendered in part and Memorandum Opinion filed February 12, 2026.**



In The

# Fifteenth Court of Appeals

### NO. 15-24-00088-CV

**APPELLANT, PLS CHECK CASHERS OF TEXAS, INC.// CROSS-APPELLANT, BOBBY WILKINSON, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS**

V.

**APPELLEES, TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS, AND BOBBY WILKINSON, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS// CROSS-APPELLEE, PLS CHECK CASHERS OF TEXAS, INC.**

**On Appeal from the 201st District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-24-002233**

### MEMORANDUM OPINION

The Texas Rent Relief program was one of several State programs that provided financial assistance to Texans during the COVID-19 pandemic. The

program was federally funded and required the Texas Department of Housing and Community Affairs (the Department) to comply with federal law in administering it. When the Department determined that a handful of checks had been sent to households that were ineligible for the funds, it issued stop payment orders on those checks. That ensured compliance with federal law.

But it prevented PLS Check Cashers of Texas, Inc. from being reimbursed after cashing those same checks for the ineligible recipients. PLS sued the Department for inverse condemnation (a takings claim) and its executive director for ultra vires conduct in denying the holder-in-due-course provisions of state law. The trial court granted the plea to the jurisdiction against the takings claim but denied it as to the ultra vires claim. We agree there is no takings claim because the Department did not "take" PLS's cash; the ineligible recipients did. But we hold there can be no ultra vires claim either, as the defendants had no discretion to disregard federal law barring payment to ineligible claimants. We therefore affirm in part and reverse and render judgment in part.

## BACKGROUND

The COVID-19 pandemic and the responses to it caused "profound economic damage" throughout the country.[1] To relieve some of the financial hardship, Congress allocated billions of dollars to state and local governments as part of the Consolidated Appropriations Act of 2021 (CAA)[2] and the American Rescue Plan Act of 2021 (ARPA).[3] As relevant here, both Acts set aside funds for rental assistance, and both placed the burden on the state and local administrators to determine whether potential recipients met eligibility requirements prescribed by

---

[1] *Texas v. Yellen*, 105 F.4th 755, 762 (5th Cir. 2024).

[2] *See* Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020).

[3] *See* Pub. L. No. 117-2, 135 Stat. 4 (Mar. 11, 2021).

2

Congress. In particular, an "eligible grantee" (defined to include a State)[4] "shall *only* use the funds" to provide "financial assistance" (primarily rent and utilities),[5] to an "eligible household"—defined as "a household of 1 or more individuals who are obligated to pay rent on a residential dwelling and with respect to which *the eligible grantee involved determines*" they meet several income- and housing-related requirements.[6]

To administer Texas's share of the federal funds, the State turned to the Department and its program, the Texas Rent Relief program (TRR). Launched in February 2021, the TRR paid "[o]ver $2.2 billion in rent and utility assistance" to help "more than 323,000" "low and moderate income Texas renters remain stably housed during the COVID-19 pandemic."[7] The TRR program closed in the summer of 2023,[8] but not before a dispute arose between the Department and PLS Check Cashers of Texas, Inc. involving the checks here.

PLS offers check-cashing services at multiple locations throughout Texas. It claims to have cashed "over 8,000" TRR checks "totaling over $37 million." But

---

[4]     *See* Pub. L. No. 116-260, 134 Stat. 2077 (CAA); Pub. L. No. 117-2, 135 Stat. 58 (ARPA).

[5]     *See* Pub. L. No. 116-260, 134 Stat. 2072–73 (CAA); Pub. L. No. 117-2, 135 Stat. 56 (ARPA) (emphasis added).

[6]     Under the CAA, an eligible grantee had to determine "(i) that 1 or more individuals within the household has (I) qualified for unemployment benefits or (II) experienced a reduction in household income, incurred significant costs, or experienced other financial hardship due, directly or indirectly, to the novel coronavirus disease (COVID-19) outbreak, which the applicant shall attest in writing; (ii) that 1 or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability …, and (iii) the household has a household income that is not more than 80% of the area median income for the household." Pub. L. No. 116-260, 134 Stat. 2077–78. The ARPA redefined a low-income family under part (iii) but otherwise provided the same. *See* Pub. L. No. 117-2, 135 Stat. 58.

[7]     *Texas Rent Relief and the Texas Eviction Diversion Program*, Texas Department of Housing and Community Affairs, https://www.tdhca.texas.gov/texas-rent-relief-and-texas-eviction-diversion-program.

[8]     *Id.*

for 30 of those checks "totaling over $150,000"—.3% of the TRR checks PLS cashed and .4% of the amounts it paid—PLS encountered a problem on the back end. According to PLS, it cashed those checks for the named recipients and then deposited them, but the checks were returned to PLS unpaid because, unbeknownst to PLS, the Department had placed stop-payment orders on them. PLS and the Department subsequently engaged in "months of communications," during which PLS demanded to be reimbursed due to its status as a holder in due course, but the Department refused, opining that "legal liability for loss" lay with PLS (according to PLS's account).

PLS eventually sued the Department for inverse condemnation and its Executive Director Bobby Wilkinson for a declaration that he acted ultra vires. On the inverse condemnation claim, PLS alleged that it has "a property interest in the value of the Checks by virtue of its holder-in-due-course status pursuant to Sections 3.301 and 3.302 of the Texas Business and Commerce Code," that the Department "refused to honor the Checks and reimburse PLS, thereby taking PLS's property without compensation," and that the Department acted intentionally in taking PLS's property, which it did for public use. On the ultra vires claim, PLS alleged that, given its status as a holder in due course, the Director "acted without legal authority" and in "direct[] conflict[] with the requirements of the Texas Business and Commerce Code" by "refusing to honor the Checks and pay PLS." PLS also sought a writ of mandamus "compelling the Director to perform these ministerial acts and to comply with the law."

The Department and the Director answered and filed a plea to the jurisdiction asserting sovereign immunity.[9] The Department argued that PLS failed to allege a valid inverse condemnation claim because it lacks a vested property

_____

[9] The Department and the Director alternatively sought dismissal under Rule 91a for the same reasons.

4

interest in the value of the checks. The Director argued that PLS failed to allege viable ultra vires and mandamus claims because he acted within the authority delegated to him under the Texas Government Code and consistent with the provisions of the federal acts requiring state and local government grantees to determine funds eligibility.

After a hearing, the trial court granted the plea to the jurisdiction as to PLS's inverse condemnation claim, finding that PLS "voluntarily and with its own consent cashed the checks." But the trial court denied the plea on the ultra vires and mandamus claims. PLS appeals the dismissal of its inverse condemnation claim, and the Director appeals the failure to dismiss PLS's ultra vires and mandamus claims.

## DISCUSSION

We first consider PLS's appeal, followed by The Director's. The question is the same in both: whether PLS adequately pleaded a claim for which the defendants do not have sovereign immunity.

Sovereign immunity from suit defeats a trial court's subject-matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). When, as here, a plea to the jurisdiction challenges the pleadings, we determine if the pleader alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Id.* at 226. We construe the pleadings liberally in favor of the plaintiff while looking to the pleader's intent. *Id.* We review the trial court's order de novo. *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021).

## I. PLS's Appeal

PLS contends that its pleadings are "sufficient as a matter of law to waive sovereign immunity for its inverse condemnation claim" because the Department's plea to the jurisdiction challenged only the sufficiency of PLS's pleadings, which

must be "taken as true." Although we do liberally construe PLS's pleadings in its favor, sovereign immunity is waived under the Texas Constitution's Takings Clause only if PLS pleaded "a *viable* allegation of taking."[10] Without "a properly pled takings claim," the Department "retains immunity." *Id.* Whether pleaded facts are sufficient to state a viable takings claim is a question of law.[11]

"When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." *Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 25 (Tex. 2024). "To prevail on an inverse-condemnation claim, the owner must plead and prove that (1) the government engaged in affirmative conduct (2) that proximately caused (3) the taking, damaging, destroying, or applying (4) of specific private property (5) for a public use (6) without paying the owner adequate compensation (7) and did so intentionally or with knowledge that the result was substantially certain to occur."[12] PLS failed to plead a valid inverse condemnation claim for at least two reasons.

*First*, PLS did not properly plead that the Department affirmatively *took* its property. The government can "take" property either physically or by regulation.[13] "Physical takings occur when the government authorizes an unwarranted physical occupation of an individual's property."[14] "A regulatory taking is a condition of use so onerous that its effect is tantamount to a direct appropriation or ouster."[15]

PLS alleged that the Department took its property when it "refused to honor the checks and reimburse PLS," which it claims occurred in "the summer of 2022,

---

[10]    *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014) (emphasis added).

[11]    *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).

[12]    *Commons of Lake Houston, Ltd. v. City of Houston*, 711 S.W.3d 666, 676 (Tex. 2025).

[13]    *Jim Olive Photography v. Univ. of Houston Sys.*, 624 S.W.3d 764, 771–72 (Tex. 2021).

[14]    *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998).

[15]    *Carlson*, 451 S.W.3d at 831.

after PLS and TDHCA's staff engaged in discussions regarding the Checks." But failing to "honor" (i.e., to pay) a check is a *failure* to act, not an *affirmative* act; as the Texas Supreme Court has said, "We have not recognized a takings claim for nonfeasance."[16] The ineligible recipients took PLS's cash; the Department just declined to replace it. We cannot imply affirmative conduct from inaction without potentially turning every government decision *not* to act into a taking.

*Second*, even if the Department's stop-payment orders could be characterized as an affirmative "taking," the Department lacked the requisite *intent* to take PLS's property. An entity acts intentionally when it either (1) "intend[s] to cause the damage" or (2) "knows that a specific act is causing identifiable harm" or that "the specific property damage is substantially certain to result." *City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex. 2004).

The record does not reflect exactly when the Department issued the stop-payment orders, but it necessarily was before the Department and PLS "engaged in discussions regarding the Checks." While it is reasonable to infer that the Department knew issuing the orders would mean the *named recipients* would not get paid (as that was the purpose), there is no allegation or inference that at that time it knew or was substantially certain *PLS* would cash the checks and request reimbursement. It is not enough that the government knows someone, "somewhere, someday," would cash the stopped checks; it must know whose property it is taking.[17] Other than the payees named on the checks (who the Department determined were not entitled to them), there is no allegation that the Department had the slightest idea that PLS would cash checks for which stop-payment orders

---

[16] *Harris Cnty. Flood Control Distr. v. Kerr*, 499 S.W.3d 793, 800 (Tex. 2016).

[17] *Id.* at 799, 800 (holding that "a specificity element runs through" Texas takings jurisprudence).

had issued.[18]

The trial court did not err by granting the Department's plea to the jurisdiction because PLS failed to allege a valid inverse condemnation claim.

## II. The Director's Cross-Appeal

In his cross-appeal, the Director challenges the trial court's failure to dismiss the ultra vires claim against him based on sovereign immunity. "Plaintiffs who seek to bypass sovereign immunity using an ultra vires claim must plead, and ultimately prove, that the defendant government official acted without legal authority or failed to perform a ministerial act."[19]

By federal law, the Director could pay funds "only" to eligible households.[20] Congress appropriated the money behind this program, and has the power under the Spending Clause to "condition[] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). Congress expressly mandated that the states "shall only use the funds" to provide rent and utility assistance to "eligible households."[21] The Department and its Director were authorized by the Texas Legislature to oversee these and other similar programs by several statutory grants.[22] Congress

---

[18]    *See Jennings*, 142 S.W.3d at 315 ("[T]here is no evidence that the City knew, when it unclogged the sewer line, that any flooding damage would occur. Nor is there evidence that the act of unclogging was substantially certain to lead to such damage.").

[19]    *Matzen*, 659 S.W.3d at 388.

[20]    Pub. L. No. 116-260, 134 Stat. 2072 (CAA); Pub. L. No. 117-2, 135 Stat. 56 (ARPA).

[21]    Pub. L. No. 116-260, 134 Stat. 2072 (CAA); Pub. L. No. 117-2, 135 Stat. 56 (ARPA).

[22]    *See* TEX. GOV'T CODE § 2306.053(b) ("The department may … (10) administer federal housing, community affairs, or community development programs, including the low income housing tax credit program; (11) establish eligibility criteria for individuals and families of low, very low, and families of moderate income to participate in and benefit from programs administered by the department; … and (14) do all things necessary, convenient, or desirable to carry out the powers expressly granted or necessarily implied by this chapter."); § 2306.071(a) ("The department may request, contract for, receive, and spend for its purposes an appropriation,

placed the burden upon them to determine whether a household met the eligibility requirements,[23] a discretionary act that PLS does not challenge. Under this framework, the Director did not commit an ultra vires act by complying with his legal duty to stop payments to ineligible recipients.

PLS argues that it is a holder in due course under state law (which the Department does not dispute), so the Director had no legal authority to refuse to pay the checks[24] absent any statutory defenses listed in § 3.305 of the Business and Commerce Code, none of which apply here.[25] But under the Supremacy Clause, state law could not limit the Director's legal authority (and duty) to comply with federal law.[26] This is one of those few cases where "a higher power has deprived the official of all of his or her discretion. In other words, the higher authority has created a *ministerial* (nondiscretionary) duty for the subordinate official to engage in conduct the plaintiff claims is wrongful."[27] Not only did the Director not act beyond his legal authority, he had no other choice.

The Director's alleged failure to comply with the "collateral" holder-in-due

grant, allocation, subsidy, rent supplement, guarantee, aid, contribution, gift, service, labor, or material from this state, the federal government, or another public or private source."); § 2306.052(b) ("The director shall (1) administer and organize the work of the department …; (4) administer all money entrusted to the department …").

[23] *See* Pub. L. No. 116-260, 134 Stat. 2077–78 (CAA); Pub. L. No. 117-2, 135 Stat. 58 (ARPA).

[24] In its briefing below, PLS argued that it was not challenging the Director's "eligibility determinations," but rather his refusal to pay the checks *after* the checks had already issued. But neither of the federal acts contain a timeframe within which eligibility determinations had to be made; they simply require that the federal funds not be paid to ineligible households.

[25] *See* TEX. BUS. COM. CODE §§ 3.104, 3.301, 3.302, 3.305.

[26] *See* U.S. CONST. art. VI, clause 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

[27] *Hall v. McRaven*, 508 S.W.3d 232, 239 (Tex. 2017).

course provisions of the Business and Commerce Code does not state a viable ultra vires claim.[28] The trial court erred by denying the Director's plea to the jurisdiction and by failing to dismiss PLS's interrelated request for a writ of mandamus.

## CONCLUSION

We affirm the trial court's order granting the Department's plea to the jurisdiction as to PLS's inverse condemnation claim, but we reverse the trial court's order denying the Director's plea to the jurisdiction on PLS's ultra vires and mandamus claims and render judgment dismissing those claims.

/s/ Scott A. Brister
Scott A. Brister
Chief Justice

Before Chief Justice Brister and Justices Field and Farris.

---

[28] *Id.* at 242.